ADAM J. ZAPALA (SBN 245748)
azapala@cpmlegal.com
JOYCE CHANG (SBN 300780)
jchang@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California  94010
Telephone:     (650) 697-6000
Facsimile:     (650) 692-3606

*Attorneys for Plaintiff Marsh*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA MARSH<br><br>        Plaintiff,<br><br>    v.<br><br>BLOOMBERG INC., BLOOMBERG L.P., d/b/a BLOOMBERG MEDIA<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR MONEY DAMAGES AND OTHER RELIEF**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

**COMPLAINT**

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................2

II.  JURISDICTION AND VENUE ..........................................................................3

III.  PARTIES ............................................................................................................3

IV.  FACTUAL ALLEGATIONS ..............................................................................4

    A.  Plaintiff Marsh's Employment at Bloomberg Media.................................4

    B.  Mr. Musolf Engaged in Repeated, Inappropriate Workplace Behavior, Culminating in Overt Sexual Advances................................................5

    C.  Plaintiff Marsh Rebuffs Her Supervisor's Repeated Requests that She Stay Overnight in his Hotel Room ...............................................6

    D.  Plaintiff Marsh's Job Duties and Work Environment Experience a Significant Downgrade After She Declines Mr. Musolf's Sexual Advances ...........................7

    E.  Plaintiff Marsh's Termination.....................................................................9

V.  CONDITIONS PRECEDENT TO FILING ACTION .........................................9

VI.  CAUSES OF ACTION .......................................................................................9

FIRST CAUSE OF ACTION
(Hostile Work Environment in the form of Sexual Harassment in violation of Cal. Gov. Code §12940(j)) ..........................................................................9

    A.  Plaintiff Marsh is Subjected to Unwanted Sexual Harassment by Mr. Musolf, her supervisor, Because she is a Woman ................................10

    B.  Mr. Musolf's Conduct was Severe and Pervasive ..................................10

SECOND CAUSE OF ACTION
(Quid Pro Quo Sexual Harassment in violation of Cal. Gov. Code §12940(a) and (j)) ...............11

    A.  Mr. Musolf Made Unwanted Sexual Advances Toward Plaintiff Marsh .............11

    B.  Mr. Musolf, By His Conduct, Made the Terms of Plaintiff Marsh's Employment Contingent on her Acceptance of his Sexual Advances .......................................11

    C.  Mr. Musolf's Conduct was a Substantial Factor in Causing Plaintiff Marsh's Harm .........................................................12

THIRD CAUSE OF ACTION
(Termination in Violation of Public Policy) ..........................................................12

VII.  PRAYER FOR RELIEF ...................................................................................13

DEMAND FOR JURY TRIAL ................................................................................14

Plaintiff alleges as follows:

I.    **INTRODUCTION**

1.    Plaintiff Amanda Marsh brings this action against Defendants Bloomberg Inc., and Bloomberg L.P., doing business as Bloomberg Media, for Hostile Work Environment Sexual Harassment and Quid Pro Quo Sexual Harassment, in violation of Cal. Gov. Code. §12940(j), and for termination in violation of public policy.

2.    Plaintiff Marsh was terminated after rebuffing her supervisor's repeated sexual advances for her to spend the night with him in his hotel room; and after having to endure severe and pervasive sexual harassment in the workplace.

3.    Plaintiff Marsh is a young, attractive, recent college graduate, who was hoping to have a long and successful career in advertising.  As one of her first jobs out of college, she began employment with Defendants on December 9, 2013.  From the beginning of her employment and up until the point that she was forced to repeatedly rebuff her Supervisor's request that she sleep with him, her Supervisor—Mr. Musolf—appeared to take a strong interest in Plaintiff.  For instance, Mr. Musolf often invited Plaintiff Marsh to meetings and business parties, as well as extending social invitations to meals and drinks.  Mr. Musolf encouraged Plaintiff Marsh to confide in him about business and personal issues.  When such occasions occurred, Mr. Musolf repeatedly invited Plaintiff Marsh to consume alcoholic beverages with him during the workday at local restaurants and bars.

4.    In doing so, Musolf often blurred the boundaries between employee and supervisor, including steering his conversations with Plaintiff Marsh to inappropriate topics.  For example, Mr. Musolf asked Plaintiff Marsh repeatedly about her dating life, including making jokes about her doing "the walk of shame" after spending the night with a man.  Throughout the course of her employment, Mr. Musolf also sent her text messages, joking about sending her nude pictures of himself and comparing himself and Plaintiff Marsh to the two main characters from the erotic romance novel *Fifty Shades of Grey.*

5.    When Plaintiff Marsh declined Mr. Musolf's sexual advances, her entire employment relationship changed for the worse.  A younger, less experienced woman took over

much of the role Plaintiff Marsh had been promised. Further, many of Plaintiff Marsh's suggestions to increase efficiency were ignored, only to be implemented immediately after she was discharged. Mr. Musolf also excluded Plaintiff Marsh from further work meetings, emails, and events that were necessary to do her job.

6. In February 2015, after over a year of Mr. Musolf declining to give Plaintiff Marsh official performance reviews but providing her with extensive positive, oral feedback, Mr. Musolf gave Plaintiff Marsh a poor performance review. This poor performance review was retaliatory, and given because Plaintiff Marsh rebuffed Mr. Musolf's sexual advances. The poor performance review, moreover, contradicted Mr. Musolf's past statements regarding Plaintiff Marsh's performance.

7. After her performance review in February 2015, Mr. Musolf held at least three private meetings with Plaintiff Marsh wherein he encouraged her to resign her position. He asked whether she was looking for jobs at other companies, and told her that he would have her fired if she refused to resign. Accordingly, Plaintiff Marsh resigned on March 2, 2015. Such a course of conduct constitutes a termination by Defendants.

## II.    <u>JURISDICTION AND VENUE</u>

8. This Court has jurisdiction over the claims raised in this complaint under 28 U.S.C. § 1332, conveying federal jurisdiction whenever the parties are diverse in citizenship. In the case, Plaintiff Marsh is a citizen of California while Defendants are citizens of New York. Accordingly, diversity jurisdiction applies.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III.    <u>PARTIES</u>

10. Plaintiff Amanda Marsh was a Sales Associate at Bloomberg Media, a division of Bloomberg L.P., from December 9, 2013 to March 2, 2015, when she was effectively terminated. While employed with Defendants, Plaintiff Marsh experienced Hostile Work Environment Harassment and Quid Pro Quo Sexual Harassment, in violation of Cal. Gov. Code §12940(a) and (j). Plaintiff Marsh is a resident of California.

11.     Defendant Bloomberg Inc. resides in New York, New York and also has its principal place of business in New York, New York. Defendant Bloomberg Inc. provides business and financial information, news, and insights through the Internet. It provides online publishing and marketing services. The company provides data, news, analytics and solutions for professional, corporate and government. It mainly operates through five segments: Bloomberg Professional, Bloomberg Enterprise, Bloomberg Tradebook, Bloomberg News & Media, and Bloomberg Business. Bloomberg Inc. conducts substantial business, and has substantial contacts, in and throughout California.

12.     Defendant Bloomberg L.P. resides in New York, New York, and also has its principal place of business in New York, New York. Defendant Bloomberg L.P. is a privately held financial software, data, and media company. It provides financial software tools such as an analytics and equity trading platform, data services, and news to financial companies and organizations through the Bloomberg terminals. It also includes a wire service (Bloomberg News), a global television network (Bloomberg Television), digital websites, radio, subscription-only newsletters, and three magazines: *Bloomberg Businessweek*, *Bloomberg Markets*, and *Bloomberg Pursuit*. Bloomberg Media is a division of Bloomberg L.P. Bloomberg L.P. conducts substantial business, and has substantial contacts, in and throughout California.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiff Marsh's Employment at Bloomberg Media

13.     Not long out of college and looking to establish a foothold in the Bay Area advertising world, Plaintiff Marsh started as a Sales Associate for Bloomberg Media on December 9, 2013.  She came to Bloomberg Media with over two years of experience in the advertising industry, both on the sales and agency side.  On the agency side, she had spent 18 months in a role that required running client meetings with the heads of major accounts, such as General Motors.  Plaintiff Marsh had managed every part of the media process, and had implemented planning strategies for Chevrolet, which involved the third largest media spend in the United States.  Her previous advertising positions were located in the Detroit market.

14. Plaintiff Marsh accepted a position at Bloomberg Media in the Bay Area because it offered great potential for advancement, including mentorship from her supervisor, Mr. Musolf, an experienced advertising executive. In offering Plaintiff Marsh the position, Mr. Musolf stated that the position was an "especially compelling opportunity for someone who wants to move into sales," and that he was looking for "someone who can ultimately work to become a co-sales partner with me." More specifically, after Plaintiff Marsh accepted the job offer, Mr. Musolf stated that he could see her moving into a full, commissioned salesperson role and promised to get her exposure to the sales processes, including sales calls. He stated that he planned to be a strong career mentor for Plaintiff Marsh.

15. Plaintiff Marsh performed well in her role as a Sales Associate. Though the Department was disorganized and provided little training or management, Plaintiff Marsh took on all of the many projects she was assigned, teaching herself new systems and managing media with which no one else had experience. Additionally, she volunteered to take on additional responsibilities, such as inputting digital campaigns for the entire West Coast.

16. Up until the point that Plaintiff Marsh rebuffed Mr. Musolf's sexual advances, Mr. Musolf provided Plaintiff Marsh with oral reassurances that she was succeeding in her position.

17. Indeed, on the same night that Mr. Musolf made overt sexual advances towards Plaintiff Marsh, he had also invited her to several business meetings and client events, and clearly valued her support on the team in handling the business and helping entertain important clients for Bloomberg.

**B.    Mr. Musolf Engaged in Repeated, Inappropriate Workplace Behavior, Culminating in Overt Sexual Advances**

18. From the beginning of Plaintiff Marsh's employment with Defendants, Mr. Musolf took a strong interest in her. For instance, Mr. Musolf often invited Plaintiff Marsh to meetings and business parties, as well as extending social invitations to meals and drinks. Mr. Musolf encouraged Plaintiff Marsh to confide in him regarding both professional and personal issues. Mr. Musolf often invited Plaintiff Marsh to daytime, business hours, drinking rendezvouses with him.

19.     As discussed, Mr. Musolf often blurred the boundaries between employee and supervisor, including steering his conversations with Plaintiff Marsh to inappropriate topics, such as her dating life, her sexual encounters with other men and references to erotic literature. Mr. Musolf made jokes to Plaintiff Marsh about her performing the "the walk of shame" after going on a date with a man, and repeatedly asked her about which dating apps she used (and how likely she and her friends were to go home with a new suitor on such a dating app) under the guise of "research," and offered to take over her dating life for her.  Throughout the course of Plaintiff Marsh's employment, Mr. Musolf sent her text messages joking about sending nude pictures of himself and comparing himself and Plaintiff Marsh to the two main characters from the erotic romance novel *Fifty Shades of Grey.*

20.     Mr. Musolf also had a disturbing and well-documented habit of inviting Plaintiff Marsh to long lunches and drinking rendezvous during the workday.  There were several occasions where he encouraged Plaintiff Marsh to slip away from the office with him to drink at lunch, or to go to restaurant bars to discuss "issues."  Indeed, he even encouraged her to consume mimosas at offsite meetings in the morning.

21.     Moreover, Mr. Musolf repeatedly encouraged Plaintiff Marsh to come in late, often intervening on her behalf to edit her schedule or to email a coworker about Plaintiff Marsh's schedule.  He frequently invited Plaintiff Marsh to extended midday meals or on alcohol breaks, sometimes requiring her to lie to other coworkers about where she was going.  Because Mr. Musolf was her boss, Plaintiff Marsh felt compelled to attend these offsite "meetings."

22.     Mr. Musolf's communications and text messages made Plaintiff Marsh feel extremely uncomfortable.  Plaintiff Marsh often responded to Mr. Musolf's references by attempting to change the course of the conversation, deflect the inquiry or outright telling him that she felt uncomfortable.

### C.     Plaintiff Marsh Rebuffs Her Supervisor's Repeated Requests that She Stay Overnight in his Hotel Room

23.     On or around May 13, 2014, Mr. Musolf and Plaintiff Marsh attended a client event.  During this event, Mr. Musolf discussed obtaining illicit narcotics for Plaintiff Marsh.  The

next evening, on or around May 14, 2014, the advertising sales team met for a "happy hour." After this event, Mr. Musolf continued to drink heavily at the bar in the lobby of the Fairmont Hotel, while Plaintiff Marsh traveled to the East Bay to run an errand.  At around 10:30pm, and at Mr. Musolf's request, Plaintiff Marsh met Mr. Musolf and some colleagues at the Fairmont Hotel bar.

24.     Once Plaintiff Marsh returned to the hotel, Mr. Musolf repeatedly requested that Plaintiff Marsh join him in taking illicit drugs.  Moreover, during the time she was with him at the Fairmont Hotel—which was no more than two hours—Mr. Musolf asked Plaintiff Marsh up to his hotel room at least 7 to 10 times.  She declined every single offer.  Eventually, after Plaintiff Marsh said that she was leaving, Mr. Musolf aggressively insisted on escorting her home, all the while asking that she return to the hotel with him.  After Plaintiff Marsh returned to her apartment, Mr. Musolf continued to text her late into the evening, attempting to get her to come back to the hotel to his room.

25.     Feeling extremely uncomfortable with her supervisor's conduct, the next day, Plaintiff Marsh asked for a meeting with Mr. Musolf prior to work to discuss the situation.  At a breakfast meeting—after Mr. Musolf asked whether she would like to drink alcoholic beverages—Plaintiff Marsh told Mr. Musolf in no uncertain terms that she was not interested in a sexual relationship with him and that she did not want the event to interfere with her job.

**D.     Plaintiff Marsh's Job Duties and Work Environment Experience a Significant Downgrade After She Declines Mr. Musolf's Sexual Advances**

26.     Plaintiff Marsh's rejection of Mr. Musolf's sexual advances interfered with her job.  After she declined the repeated requests to stay overnight, Plaintiff Marsh's entire employment relationship changed for the worse.

27.     Shortly thereafter, a younger, less experienced woman took over the role Plaintiff Marsh had been promised by Mr. Musolf.  Further, Plaintiff Marsh made many suggestions to increase efficiency that were ignored, only to be implemented later, when she was effectively discharged.

28.     Mr. Musolf also consistently excluded Plaintiff Marsh from work meetings, emails, and events that were necessary to do her job, and access to the professional advancement that she was promised.

29.     Finally, in February 2015, after over a year of Mr. Musolf declining to give Plaintiff Marsh official performance reviews but providing her with extensive positive, oral feedback, Mr. Musolf gave her a poor performance review.

30.     This poor performance review was retaliatory, motivated by Plaintiff Marsh's spurning of Mr. Musolf's sexual advances.  Mr. Musolf had previously stated to Plaintiff Marsh that he had little idea what it took to perform the day to day work of Plaintiff Marsh's job. Despite this admission, the poor performance review included detailed feedback on areas in which Mr. Musolf had no actual insight.

31.     In light of Mr. Musolf's previous assurances that Plaintiff Marsh was succeeding in her job, the poor performance review came as a surprise.  In over a year that she had been employed with Bloomberg, Mr. Musolf had not provided her with any formal, written performance review, despite promising to do so.  Moreover, much of the substance of the poor performance review Mr. Musolf provided her in February 2015 explicitly contradicted past comments he had made concerning her strong performance.  Generally, Mr. Musolf had provided Plaintiff Marsh with positive feedback, indicating that she was performing well in her role and was actually in line for a promotion.

32.     After the hotel incident, Plaintiff Marsh confided in Keith Grossman, the digital publisher from New York, who was responsible for 1/3 of the media division in North America, about Mr. Musolf's sexual advances towards her. Mr. Grossman was higher up the organizational chart and Plaintiff Marsh hoped that reporting such information would stop the conduct and ensure that she was not retaliated against for refusing to engage in sexual conduct with her supervisor.  Rather than reassuring Plaintiff Marsh that these very serious allegations would be taken seriously and investigated, Mr. Grossman told Plaintiff Marsh a story of how a former boss had treated him poorly, and how that had motivated him to leave that company and become wildly successful elsewhere, at Wired Magazine.  Plaintiff Marsh understood Mr. Grossman's

reaction to be encouragement for her to leave her position at Bloomberg Media, rather than attempting to address the serious allegations against Mr. Musolf.

### E.   Plaintiff Marsh's Termination

33.     After her performance review in February 2015, Mr. Musolf held at least three private meetings with Plaintiff Marsh wherein he encouraged her to resign her position.  He asked whether, in light of her performance review, she was looking for jobs at other companies, and what he could do to assist her in that process.  In addition to being retaliatory, the motivation behind the poor performance review was to push Plaintiff Marsh out.  Mr. Musolf also told Plaintiff Marsh that if she attempted to stay in her job long enough to accrue vacation time, he would be "forced to escalate" her poor performance review—meaning that if she did not resign, Mr. Musolf would have her fired.  Later, Mr. Musolf made clear to Plaintiff Marsh that if she did not resign, he would have her fired.  Accordingly, Plaintiff Marsh was constructively discharged on March 2, 2015.

## V.    CONDITIONS PRECEDENT TO FILING ACTION

34.     Plaintiff Marsh has complied with all required conditions precedent prior to filing this action.

35.     Plaintiff has complied with any pre-law suit filing requirements, including, but not limited to, receiving a right to sue letter from the Department of Fair Housing and Employment ("DFEH") for the claims covered by this lawsuit.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Hostile Work Environment in the form of Sexual Harassment in violation of Cal. Gov. Code §12940(j))**

36.     Plaintiff incorporates herein by reference each and every allegation in the complaint as though fully set forth herein.

37.     Cal. Gov. Code §12940 protects employees from harassment based on their gender, including sexual harassment, that causes a hostile or abusive work environment.  As alleged herein, Plaintiff Marsh was sexually harassed by her supervisor, Mr. Musolf, that conduct

was severe or pervasive such that it altered the terms of her work environment, and that Plaintiff Marsh experiencing sexual harassment was a substantial factor in her termination.

38.    At all relevant times, Defendants were Plaintiff Marsh's employer for the purposes of §12940.  Mr. Musolf was Plaintiff Marsh's supervisor.

**A.    Plaintiff Marsh is Subjected to Unwanted Sexual Harassment by Mr. Musolf, her supervisor, because she is a Woman**

39.    Mr. Musolf repeatedly engaged Plaintiff Marsh in inappropriate conversation topics, including about sex, dating, drinking together and erotic literature.  For example, he repeatedly asked Plaintiff Marsh about her dating life, including making jokes about her doing "the walk of shame" after spending the night with a man.

40.    Mr. Musolf joked to Plaintiff Marsh about sending nude pictures of himself.  He also compared himself and Plaintiff Marsh to the two main characters from the erotic romance novel *Fifty Shades of Grey*.

41.    Finally, Mr. Musolf repeatedly requested that Plaintiff Marsh join him in taking illicit drugs. On or around May 14, 2014, Mr. Musolf invited Plaintiff Marsh up to his hotel room at least 7 to 10 times.  She declined every single offer.  Eventually, after she insisted on leaving, Mr. Musolf unnecessarily escorted her home, all the while insisting that she return to the hotel with him.  Later, Mr. Musolf continued to text Plaintiff Marsh late into the evening, attempting to get her to come back to the hotel.

**B.    Mr. Musolf's Conduct was Severe or Pervasive**

42.    Mr. Musolf's inappropriate conduct went on for a significant amount of time, was unwelcome, and was unambiguously rejected.

43.    For example, as alleged *supra*, Mr. Musolf's inappropriate conduct extended for several months, from Plaintiff Marsh's first days in her position at Bloomberg Media until she turned down his overt sexual advance.  These conversations were unwelcome and made Plaintiff Marsh extremely uncomfortable, and she informed Mr. Musolf of these facts.

44.    Plaintiff Marsh being sexually harassed was a substantial factor in causing her termination.

1
2
3

## SECOND CAUSE OF ACTION

**(Quid Pro Quo Sexual Harassment in violation of Cal. Gov. Code §12940(a) and (j))**

45.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

46.    Cal. Gov. Code §12940 protects employees from sexual harassment.  At all relevant times, Defendants were Plaintiff Marsh's employer and Mr. Musolf was her supervisor.

### A.    Mr. Musolf Made Unwanted Sexual Advances Toward Plaintiff Marsh

47.    As discussed *supra*, Mr. Musolf repeatedly engaged Plaintiff Marsh in inappropriate conversations of a sexual nature and invited her on daytime drinking escapades away from the office.  Finally, on May 14, 2014, Mr. Musolf—in a highly inebriated state—asked Plaintiff Marsh to come up to his hotel room at least 7 to 10 times. She declined every single offer.  Eventually, after she insisted on leaving, Mr. Musolf aggressively insisted on escorting her home, all while insisting that she return to the hotel with him. Later, Mr. Musolf continued to text Plaintiff Marsh late into the evening, attempting to get her to come back to the hotel.

### B.    Mr. Musolf, By His Conduct, Made the Terms of Plaintiff Marsh's Employment Contingent on her Acceptance of his Sexual Advances

48.    The difference between Plaintiff Marsh's work environment and career trajectory at Bloomberg before and after she rejected Mr. Musolf's sexual advances was striking.  By his actions, Mr. Musolf made it clear that Plaintiff Marsh was no longer welcome in the office, going so far as threatening to fire her if she refused to resign.

49.    Prior to his sexual advances, Plaintiff Marsh was told that she excelled in her job, that she was successfully communicating with her coworkers and volunteering to take on additional work.

50.    Prior to the hotel incident, Mr. Musolf invited Plaintiff Marsh to business meetings and parties, and advised her on work, and personal matters.  He clearly valued her support on the team in handling the business and helping entertain important clients for Bloomberg.  Indeed, as

Law Offices
COTCHETT, PITRE
& MCCARTHY, LLP

late as the very night that Mr. Musolf invited Plaintiff Marsh to his room, he invited her to several business meetings and client events.

51.     By contrast, after Plaintiff Marsh rejected Mr. Musolf's sexual advances, she was excluded from the resources necessary for her to do her job successfully.  She was not included in relevant work meetings and emails and she was excluded from business events, including being the only sales employee not invited to the annual sales conference that Fall.  Further, her suggestions for increased efficiency were ignored.  Most striking, a younger, less experienced female took over the entire role Plaintiff Marsh had been promised by Mr. Musolf.

52.     After the hotel event, she was ignored and subsequently given a poor performance review.  Thereafter, Mr. Musolf held at least three private meetings with Plaintiff Marsh wherein he encouraged her to resign her position.  At one point, when Plaintiff Marsh expressed interest in taking vacation, he told her that if she intended to stay in her job long enough to accrue that time, he would be "forced to escalate" her poor performance review—meaning that if she did not resign, Mr. Musolf would have her fired.  Mr. Musolf subsequently informed her that she should resign or be terminated.  Placed in an impossible position, Plaintiff Marsh resigned.  Her constructive discharge took place, therefore, on or around March 2, 2015.

C.     **Mr. Musolf's Conduct was a Substantial Factor in Causing Plaintiff Marsh's Harm**

53.     As alleged *supra*, after Plaintiff Marsh rebuffed Mr. Musolf's sexual advances, Mr. Musolf ignored her, promoted a younger, less experienced female above her, denied her communications crucial for doing her job, and gave her a poor performance report that ran counter to his statements just months before.   Finally, after rebuffing the sexual advances, Mr. Musolf forced Plaintiff Marsh to resign or face termination.

54.     Plaintiff Marsh's termination caused her harm.

### THIRD CAUSE OF ACTION

### (Termination in Violation of Public Policy)

55.     Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein

56.   The foregoing acts also constitute an unlawful termination in violation of public policy under California law.  *See Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980).

57.   Under *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980), it is unlawful for an employer to discharge an employee for reasons that violate public policy. In this case, Defendants' conduct violates public policy by terminating Plaintiff Marsh because of her gender.

58.   At all times relevant to this complaint, Defendants were Plaintiff Marsh's employer for purposes of *Tameny*.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment in its favor and against Defendants as follows:

1.   For damages, and all other appropriate legal and equitable relief;

2.   For back pay, front pay, compensatory damages, damages for infliction of emotional distress, and punitive damages;

3.   For reasonable attorneys' fees and costs;

4.   For appropriate injunctive and declaratory relief;

5.   For costs of suit herein; and

6.   For such further relief as the Court may deem just and proper.

Dated:  May 17, 2016          **COTCHETT, PITRE & McCARTHY, LLP**


By:      */s/ Adam J. Zapala*
         ADAM J. ZAPALA

         *Attorney for Plaintiff Marsh*

## DEMAND FOR JURY TRIAL

Plaintiff Amanda Marsh demands a jury trial on all issues so triable.


Dated:  May 17, 2016                **COTCHETT, PITRE & McCARTHY, LLP**


By:     _/s/ Adam J. Zapala_____
        ADAM J. ZAPALA

        *Attorneys for Plaintiff Marsh*

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

**COMPLAINT**                                                        14